# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **GARNICE WINEBARGER,** | )<br>) |
| Plaintiff, | ) Case No. 2:07CV00049<br>) |
| v. | ) **OPINION**<br>) |
| **LIBERTY LIFE ASSURANCE** | ) By: James P. Jones |
| **COMPANY OF BOSTON,** | ) Chief United States District Judge<br>) |
| Defendant. | ) |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff; E. Ford Stephens, Christian & Barton, L.L.P., Richmond, Virginia, for Defendant.*

The plaintiff brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001-1461 (West 1999 & Supp. 2008), challenging the termination of his long-term disability benefits. After a careful review of the administrative record, I find that the plaintiff's benefits were terminated in error, and I will direct their reinstatement.

I

The plaintiff, Garnice Winebarger, seeks review of the decision by the defendant, Liberty Life Assurance Company of Boston ("Liberty"), terminating his long-term disability ("LTD") benefits under the provisions of its Group Disability

Income Policy ("the Policy"). Liberty has filed the administrative record of its decision and based on that record, both parties have moved for summary judgment. The issues have been briefed and the case is ripe for decision.[1]

Winebarger, who is currently fifty-five years old, worked in a coal mine. His employer provided LTD benefits through the Policy to its employees, with claims administered and paid by Liberty. Under the Policy, "disability" or "disabled" is defined as follows:

 1. For persons other than pilots, co-pilots, and crew of an aircraft:

 a. i. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

   ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

---

[1] Neither party has requested oral argument and I find that the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

(L 00007.)[2]

Winebarger had arthroscopy on his left knee in December of 2001 after an on-the-job injury. He returned to work on light duty in January of 2002. In March of 2002, while working, he nearly fell and in catching himself, injured his left shoulder. He has not worked since April of 2002.

Winebarger applied for and was granted short-term disability benefits under the Policy, and thereafter sought LTD benefits, which were granted effective June 15, 2002. In September of 2004 he underwent arthroscopy of his left shoulder. After 24 months of LTD benefits had been paid, Liberty notified Winebarger that he qualified for a continuation of these benefits under the stricter "any other occupation" test set forth in the Policy.

In spite of granting Winebarger continuing LTD benefits, Liberty continued to have his case evaluated and by letter dated May 26, 2006, Liberty advised Winebarger that he was no longer considered disabled beyond May 14, 2006, and refused further LTD benefits.

---

[2] References are to the pages of the claim record supplied by Liberty.

On September 6, 2006, the Social Security Administration found that Winebarger was disabled within the meaning of the Social Security Act as of May 1, 2004, based on "musculoskeletal and immune system impairments." (R. at 123.)[3]

Winebarger administratively appealed Liberty's claim decision, supplying it with the social security decision and other medical information. By letter dated November 7, 2006, Liberty reaffirmed its prior decision. This action followed.

II

When reviewing the denial of benefits in a case brought under ERISA, a court applies a de novo standard of review unless the relevant benefit plan grants the administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the court finds that the plan does vest in its administrator such discretion, the court must then decide whether the administrator acted within the scope of its vested discretion. *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d. 518, 522 (4th Cir. 2000). As long as the administrator acted within the

---

[3] Winebarger initially filed for social security benefits in November 2002, which application was denied. He refiled in February 2003, and received a hearing before an administrative law judge in August of 2006, over three years later. That hearing resulted in the favorable ruling of September 6, 2006.

- 4 -

scope of its conferred discretion, the court must review the denial of benefits under the deferential abuse of discretion standard. *Ellis v. Metro. Life Ins. Co.*, 126 F.3d. 228, 232 (4th Cir. 1997).

The denial of LTD benefits here should be reviewed under an abuse of discretion standard, because the Policy explicitly confers discretionary authority on Liberty. The Policy states in relevant part that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (R. at L 00026.) This language is sufficient to confer discretion, and not merely authority, in the determination of benefits. *See Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 323-24 (4th Cir. 2008).

Under the deferential abuse of discretion standard, a court will not disturb the administrator's decision as long as it is objectively reasonable, even if the court would have reached a different conclusion. *Doe v. Group Hospitalization & Med. Servs.*, 3 F. 3d. 80, 85 (4th Cir. 1993). An administrator's decision will be considered reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997) (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). In considering whether the administrator's decision was reasonable, one important factor is "the adequacy of the materials considered to make the decision

and the degree to which they support it." *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342 (4th Cir. 2000).

"Substantial evidence" in support of a plan decision is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), being "more than a mere scintilla," *id.*, but "less than the weight of the evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

It is necessary to consider the inherent conflict of interest created by a plan administrator who both decides and funds claims, even "where (as here) the plan administrator is not the employer itself but rather a professional insurance company." *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2349 (2008). When there is a conflict of interest, it "must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co.*, 489 U.S. at 115 (internal quotations omitted).

III

The basic facts of this case as disclosed by the administrative record are as follows.

After his initial work injury in 2001, Winebarger was treated by William A. McIlwain, M.D., an orthopaedic surgeon. Dr. McIlwain performed the surgery on Winebarger's left knee in 2001 and on his left shoulder in 2004. Winebarger continued to complain of pain in his left shoulder, as well as in his neck, back, and hip. Dr. McIlwain advised against further surgery. Previous X rays in Dr. MMcIlwain's office showed degenerative disc disease in Winebarger's cervical spine, as well as "severe L5-S1 disc space collapse." (L 01169.)

In 2004, prior to his shoulder surgery, Winebarger was referred by Liberty for a Functional Capacity Evaluation by Heartland Rehabilitation Services. The report of the evaluation found that "[o]verall, data and clinical observation suggest self-limiting behavior, inconsistent effort and symptom magnification behavior." (L 01344.)[4] However, an evaluation of Winebarger obtained by Winebarger's social security attorney in late 2003 from William E. Kennedy, M.D., an orthopaedic surgeon, found that "[t]here was satisfactory correlation among the objective findings

---

[4] In its letter terminating Winebarger's benefits, Liberty stated that the Functional Capacity Evaluation had been ordered by Dr. McIlwaine, Winebarger's physician. But the notice to Winebarger directing him to appear for the evaluation stated that it was at Liberty's request and that Liberty would pay for it. (L 01425.) After the evaluation, Winebarger complained in writing that the examiners had been rude to him and had hurt his shoulder in the process of testing him. Winebarger did have a Functional Capacity Evaluation by a different company in 2002 upon referral by Dr. McIlwaine and that evaluation found that Winebarger gave his full physical effort on the tests and that his subjective reports of limitations were reliable. (L 01607-08.)

- 7 -

of record and of this examination and the symptoms and losses of function . . . ." (L 01433.)

Liberty also had an insurance investigator perform surveillance and conduct an unannounced interview with Winebarger and his wife in late 2003. No evidence of lack of disability was uncovered and in the interview, Winebarger confirmed his injuries and said that he was also being treated by his family physician for high blood pressure, depression, and anger management.[5]

On May 7, 2004, Winebarger was evaluated by L. Andrew Steward, Ph.D., a licensed clinical psychologist, in connection with Winebarger's application for social security benefits. Dr. Steward found that Winebarger was suffering from severe depression and anxiety, "consistent with the symptoms of a chronic pain syndrome." (L 01036.) He stated that this diagnosis was "confirmed by behavioral reports; mental status observations; and BAI, BDI-II, and MMPI-2 test results." (*Id.*)[6]

---

[5] Because his injuries occurred on the job, Winebarger asserted workers' compensation claims which he eventuality settled with his employer in 2003 for $80,000. In addition, his employer paid his medical expenses to date of $32,312.96. During the course of that litigation, in July 2002, his employer engaged an investigator to conduct a video surveillance of Winebarger, which showed him working in his yard. The surveillance also showed Winebarger walking with and without a cane and walking with and without a limp.

[6] MMPI-2 is the latest version of the Minnesota Multiphasic Personalty Inventory, a standardized written personalty test, used to assist in diagnosing psychopathology. *See* Wikipedia, *Minnesota Mutiphasic Personalty Inventory*, http://www.wikipedia.org. (last visited July 29, 2008). BAI stands for Beck Anxiety Inventory, another self-report inventory used to measure anxiety. *See id., Beck Anxiety Inventory.* BDI-II is the latest version of the

- 8 -

Case 2:07-cv-00049-JPJ   Document 31   Filed 08/15/08   Page 8 of 18   Pageid#: 198

Dr. Steward found that Winebarger was "permanently and totally disabled from any type of substantial gainful occupation on a sustained basis for at least a year or more" and that his "prognosis appears poor." (*Id.*)

Winebarger was also evaluated a year earlier, on August 12, 2003, by another psychologist, Robert Spangler, also in connection with the social security case, who found Winebarger to have a "history of depression, anxiety and intermittent explosive episodes since his physical injury" and diagnosed him as suffering from mild depressive and anxiety disorders. (L 01051.)

Winebarger had also been treated by his primarily care physician, Steven R. Prince, M.D., for depression. In 2003 Dr. Prince prescribed Celexa and Zyprexa.[7] (L 00968-69.) Dr. Prince left an office practice and Winebarger's more recent primary care physician, Christopher M. Basham, M.D., advised Liberty that he believed that Winebarger "would have great difficulty in any type of gainful employment" because of his physical and emotional problems. (L 01007.)

---

Beck Depression Inventory, used to measure the severity of depression. *See id., Beck Depression Inventory.*

[7] Celexa is used to treat major depression. *The PDR Guide to Prescription Drugs* 238 (4th ed. 2000). Zyprexa is an anti-psychotic medication. *Id.* at 1491.

Liberty's consulting physician, Richard Avioli, M.D., reviewed Winebarger's file and wrote to Dr. McIlwaine requesting information. Dr. McIlwaine responded by letter dated April 26, 2006, stating:

> It appears that Mr. Winebarger has been successful in avoiding return to work. I make note [sic] the fact that as far away as June 24, 2002, Mr. Winebarger was offered a job that was within his limits and he personally told the company that he could not take the job. As I have documented in my record of June 24, 2002, Mr. Winebarger was given that offer and was offered a three-wheeler in fact to drive around on. The fact that he did not take that job and yet was allowed to continue on his compensable claim is a mystery to me.

(L 01119.)

On May 16, 2006, a few days before Liberty terminated Winebarger's benefits, Winebarger returned to Dr. McIlwaine and explained to him that he had not refused a job back in 2002. In his notes of that encounter, Dr. McIlwaine stated:

> [Winebarger] has long-term disability and the patient indicates to me that the company was going to suspend payments because they think that he is going back to work. I had mentioned in my response to the inquiry from Dr. Avioli that the patient had been offered a job that was within his limits, but apparently did not work out. Mr. Winebarger indicates that in contradistinction to what I was given to understand, that he was not given a job offer wherein he would have a 3-wheeler to drive around in. That would somewhat clear up the matter of my failure to understand what [sic] that would have been a problem.
>
> What I noted was that he could return to work if a 3-wheeler were made available to him, and I gave him a restricted work slip as well. That, however, also did not come to fruition due to the fact that the company

went out of business, the company was shut down and there was no job to go back to.

(L 00955-56.)

On September 29, 2004, certain of Winebarger's case records were evaluated by Liberty consultant H.D. Kirkpatrick, Ph.D., a forensic psychologist. Dr. Kirkpatrick focused on Dr. Spangler's evaluation, and reported that "Dr. Spangler's testing does not really measure for anxiety and depression. Overall, his diagnostic picture appears to be founded on the claimant's self-report, and thus may or may not be accurate or valid." (L 01198.) He concluded that

> Based on my review of the case data . . . there are insufficient data at this time to support a finding that the claimant has an impairment due to a psychiatric/psychological disorder. Specifically, the records reviewed do not provide enough information to support a diagnosis of major depression or severe anxiety.

(L 01195.)

In its letter to Winebarger of May 26, 2006, terminating his LTD benefits, Liberty stated:

> In May of 2006, you provided us with psychological examinations that took place in 2003 and 2004. We do not have any information that you have or are receiving treatment for depression or bipolar disorder since 2004.

(L 01022.)

Winebarger administratively appealed the decision, and provided Liberty with the recent favorable social security decision. By letter dated November 7, 2006, the appeal was denied. In the letter, Liberty noted Dr. McIlwaine's report that Winebarger had refused a job within his physical limits, a ground not relied upon in Liberty's initial letter of termination. The letter stated that in order to provide the claim "a full and fair review," it had been referred to Liberty's Managed Disability Service Unit and that the review by that unit had concluded as follows:

> Assessment: Most treatment for his knees, shoulders and wrists occurred back in 2002-2004. We have no current information from his treating physicians that these conditions are ongoing. Osteoarthritis of his hands is mild, consistent with age. There is no evidence that claimant is treating with anyone for his depression, which appears to be stable since 2004. The neuropsychological testing was initiated by his attorney in order to get SSDI, not from his Primary Care Physician because of cognitive or depressive complaints. HTN is also controlled. Consulting Physician opined that claimant was capable of medium work and it appears that Dr. McIlwain agreed. The information received on appeal is consistent with that already reviewed by Consulting Physician and therefore, his restrictions and limitations are still reasonable.

(L 00927-28.)

IV

As directed by the Supreme Court in it recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2343 (June 19, 2008), I must evaluate Liberty's conflict of interest in determining whether it abused its discretion in denying Winebarger's claim. *Id.* at 2351. As in *Glenn*, there is no indication in this record that Liberty took affiramtive steps to "reduce potential bias and to promote accuracy" in its claim processing, and thereby lessen the effects of the inherent conflict. *Id.* Moreover, there is the indication, as in *Glenn*, that Liberty emphasized certain medical reports favoring denial of benefits and "de-emphasized certain other reports that suggested a contrary conclusion." *Id.* at 2352. In *Glenn*, as in the present case, Liberty took inconsistent positions by encouraging the claimant to seek social security benefits, and then ignoring the finding of the Social Security Administration that the claimant was disabled from any employment. *Id.*

There are several examples apparent in the record in which Liberty over-valued the medical evidence supporting a denial of benefits, and under-valued or ignored contrary evidence.

For example, Liberty expressly relied upon Dr. McIlwaine's accusation that in 2002, prior to his shoulder surgery, Winebarger refused work that he was physically able to perform. On the other hand, Liberty did not consider Dr. McIlwaine's later

- 13 -

retraction of that accusation, after Winebarger had talked directly to Dr. McIlwaine and denied those circumstances.[8]

Liberty stated that Dr. McIlwaine had "responded back to us stating that yes you can perform sedentary to light work and yes you can perform medium duties of occasionally lifting up to 50 pounds and frequently lifting up to 20 pounds." (L 01022.) This response allegedly came to Liberty in the form of handwritten notes on a letter sent to Dr. McIlwaine by Dr. Avioli, Liberty's in-house consultant. However, what Dr. McIlwaine meant by his cryptic notes is unclear.[9] Moreover, his "response"

---

[8] This ground was relied upon in Liberty's denial of Winebarger's appeal of the initial termination of LTD benefits. While there is no binding precedent in this circuit, there are unpublished opinions holding that only the plan administrator's initial grounds of denial will be considered by the court as justification for withholding benefits, and not any later rational relied upon in an administrative appeal, in order to prevent beneficiaries from being "sandbagged by post-hoc justifications of plan decisions." *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589, 593 (4th Cir. 2007) (unpublished) (quoting *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F3d 279, 287 (2d Cir. 2000)); *see also Thompson v. Life Ins. Co. of N. Am.*, 30 F. App'x 160, 164 (4th Cir. 2002) (unpublished).

[9] The letter sent by Dr. Avioli, which outlined Winebarger's medical history, stated in a concluding paragraph as follows:

> Based on the above, what do you believe are Mr. Winebarger's functional abilities at this time? Do you believe that he is capable of light/sedentary duties? Could he perform medium duties which require occasional lifting of 50 pounds and frequent lifting of up to 20 pounds? Do you believe that his back complaints will require surgical intervention, and if so what will determine this? Are you aware of any other physicians who are treating Mr. Winebarger at this time?

(L 01024.)

came before Winebarger explained to him that he had not refused a job in 2002. After his examination of Winebarger on May 16, 2006, when Winebarger explained that he had not refused work back in 2002, Dr. McIlwaine did not opine that Winebarger was able to work.

Liberty relied upon its Functional Capacity Evaluation, performed by Heartland Rehabilitation Services, which reported "symptom magnification behavior" by Winebarger. (L 01344.) On the other hand, it did not rely on the similar Functional Capacity Evaluation performed upon referral by the treating physician, which found that Winebarger's subjective reports of limitations were reliable.

Liberty gave no weight to the opinion of Dr. Steward, who found Winebarger completely disabled because of his mental condition, on the grounds that (1) there was insufficient information in the record to support such a diagnosis; and (2) there was no indication that Winebarger was being presently treated for depression. (L 01021-22.) In its later consideration in the administrative appeal, Liberty also rejected this basis for disability on the ground that Winebarger had been referred to Dr. Spangler by his attorney in the social security case. (L 00927.)

---

Dr. McIlwaine replied by returning to Dr. Avioli the page on which this paragraph appeared, with a handwritten "Yes" on either side of this paragraph, one next to the first line on the left and the other near the third line on the right and with a line marked below the words "capable of light/sedentary." (*Id.*) It is speculative as to what Dr. McIlwaine meant.

- 15 -

In fact, Winebarger's treating primary care physicians had both diagnosed him with these mental impairments. Dr. Basham, Winebarger's current primary care physician, reported it to Liberty as late as July 2006, during Liberty's consideration of Winebarger's appeal. (L 01006-07.) The record is full of reports of Winebarger's depression and anxiety, including that of Liberty's surveillance agent, who advised Liberty of the concerns by Winebarger's wife in this regard. Dr. McIlwaine reported as late as May 2006 that Winebarger continued to take Celexa, the depression medication.

In his report to Liberty on Winebarger's case in March of 2006, Dr. Avioli advised Liberty that Dr. Kirkpatrick, Liberty's consulting psychologist, recommended a "Forensic Psychological IME that could provide not only an independent exam of the claimant's functioning but also analyze the raw data considered by Drs. Steward and Spangler." (L 01127.) Dr. Avioli noted that no such independent medical examination had taken place.[10]

---

[10] In its brief, Liberty alternatively contends that even if it should have credited Dr. Steward's opinion that Winebarger suffered from a disabling mental impairment, the Policy limited benefits based on mental disorders to twenty-four months. However, that was not a basis for Liberty's termination of benefits, either initially or on the administrative appeal.

- 16 -

Case 2:07-cv-00049-JPJ   Document 31   Filed 08/15/08   Page 16 of 18   Pageid#: 206

Because I find the same indications of conflict-driven decision making as highlighted by the Supreme Court in its recent *Glenn* case, I must set aside the denial of benefits and award judgment to the plaintiff Winebarger.[11]

V

The plaintiff also seeks attorneys' fees. While I have the power to award such fees, after considering the relevant factors, I find that such an award should not be made. *See Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993) (listing factors to guide the court in exercising its discretion to award attorneys' fees under ERISA). Liberty operated under a conflict of interest, but there is no evidence of bad faith and the relative merits of the dispute do not compel a

---

[11] In his concurrence in the judgment in *Glenn*, Chief Justice Roberts criticized the majority approach by which a conflict enhances the significance of other factors and warned that the "end result" of the decision "is to increase the level of scrutiny in every case in which there is a conflict—that is, in many if not most ERISA cases—thereby undermining the deference owed to plan administrators when the plan vests discretion in them." *Id.* at 2353. The Chief Justice would consider the conflict only where there was evidence that the plan decision was motivated or affected by the conflict. *Id.* Nevertheless, he supported setting aside the plan administrator's decision because he felt that overturning it was justified regardless of whether or not there was a conflict on the administrator's part. *Id.*

Obviously, I must follow the majority opinion's approach by applying the "existence of a conflict to enhance the significance of other factors." *Id.* at 2352. (Roberts, C.J., concurring in the judgment).

determination that attorneys' fees for the plaintiff are appropriate. The other relevant factors are inapplicable in this case.

VI

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be granted and the defendant's Motion for Summary Judgment will be denied. Judgment will be entered for the plaintiff directing Liberty to reinstate the plaintiff's LTD benefits retroactively to May 15, 2006. The parties have stipulated that because of the social security payments made to the plaintiff without the required reduction in his LTD benefits, Liberty is entitled to judgment against the plaintiff on its Counterclaim in the sum of $32,767.30. The plaintiff's request for attorney's fees will be denied.

        DATED: August 15, 2008

        /s/ JAMES P. JONES
        Chief United States District Judge

- 18 -

Case 2:07-cv-00049-JPJ   Document 31   Filed 08/15/08   Page 18 of 18   Pageid#: 208